#### HOUSTON PRESS CO. v. SMITH.
#### (No. 9014.)

Court of Civil Appeals of Texas. Galveston.
Feb. 10, 1928.

Rehearing Denied March 8, 1928.

**1. Libel and slander ⬅69—Unless articles libelous per se were privileged or true, plaintiff would be entitled to at least nominal damages (Rev. St. 1925, art. 5432).**

Unless statements relating to public official in newspaper articles which were libelous per se were true or shown to be privileged, under Rev. St. 1925, art. 5432, plaintiff would be entitled to recover at least nominal damages.

**2. Libel and slander ⬅48(2)—Reasonable comment or criticism of official acts of public officers is privileged, in absence of actual malice (Rev. St. 1925, art. 5432).**

A reasonable and fair comment or criticism of official acts of public officers and other matters of public concern published for general information is, under Rev. St. 1925, art. 5432, privileged and forms no basis for libel action without proof of actual malice.

**3. Libel and slander ⬅123(8)—Whether publication is privileged as fair comment or criticism of official acts of public officials is question for jury (Rev. St. 1925, art. 5432).**

Whether a publication is a reasonable and fair comment or criticism of official acts of a public official, and hence privileged under Rev. St. 1925, art. 5432, is a question for the jury to be determined from the evidence.

**4. Libel and slander ⬅48(2)—Right to criticize acts of public men does not authorize false statements (Rev. St. 1925, art. 5432).**

Right to criticize acts of public officials, under Rev. St. 1925, art. 5432, does not embrace right to make false statement of facts, to attack private character of a public officer or to impute to him malfeasance or misconduct in office.

**5. Libel and slander ⬅48(3)—Character of candidate for honesty, integrity, and matters affecting his qualification and fitness for office are proper subjects for reasonable comment (Rev. St. 1925, art. 5432).**

When a man becomes a candidate for office, his character for honesty, integrity, and matters which affect his qualification and fitness for office are put before the public and are proper subjects for fair and reasonable comment, within Rev. St. 1925, art. 5432.

**6. Libel and slander ⬅123(8)—Whether article charging that district attorney boasted of membership in secret organization and had committed acts unfitting him for office was reasonable and fair criticism held for jury (Rev. St. 1925, art. 5432).**

Where plaintiff at time of alleged libelous publication was district attorney, and candidate for re-election on Ku Klux Klan ticket, whether statement in newspaper article that he boasted of membership in organization which required oath that supersedes oath as public official and that he was pledged soul and body to Klan and committed many acts stamping him as unfit for office was a reasonable and fair criticism of him as an officer and candidate, within Rev. St. 1925, art. 5432, held for jury.

**7. Libel and slander ⬅10(3)—Statements that district attorney took no part in murder and arson investigation imputed dishonesty and corruption, and, unless true, were libelous.**

Statements in newspaper that double murder and arson had been committed, that district attorney's office refused request to take part in investigations, and that district attorney's office had man devoting time to gathering evidence of anti-trust law violations, and there were some big fees in that, held to impute to district attorney dishonesty and corruption, and, unless proved true, were actionable.

**8. Libel and slander ⬅10(3)—Newspaper article charging that district attorney secretly quashed indictment and hid facts disclosed by investigation held libelous per se and actionable, unless true.**

Publication in newspaper that district attorney secretly quashed indictment charging murder and attempted to hide facts disclosed by investigation and blocked granting of immunity to witness jointly charged with murder so she could testify against codefendant was libelous per se, and, unless true, was actionable.

**9. Libel and slander ⬅54—Truth of article against district attorney libelous per se constitutes defense.**

Truth of newspaper article which is libelous per se as respects charges against district attorney constitutes defense to action for libel.

**10. Libel and slander ⬅48(2, 3), 51(5)—Criticism of public officer or candidate concerning qualification is privileged, unless actual malice is shown, or charge is ground for removal (Rev. St. 1925, art. 5432).**

Criticism of official acts or conduct of public official or candidate for public office or concerning his fitness or qualifications is privileged, under Rev. St. 1925, art. 5432, unless actual malice is shown, or charge is of such nature as to be ground for removal from office.

**11. Libel and slander ⬅10(1)—If criticism or charge against officer is ground for removal from office, truth is only defense.**

If criticism of official acts or conduct of officer or candidate or charge made against him is of such nature as to be ground for removal from office, truth is only defense to action for libel.

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

12. Libel and slander ☞30—Newspaper publication need only be substantially true and mere inaccuracies in articles are immaterial.

Newspapers are not held to exact facts nor to most minute details of transactions they publish, the law requiring only that publication shall be substantially true, and mere inaccuracies not affecting materially the report of the article are immaterial.

13. Libel and slander ☞123(8)—Whether article charging that district attorney had not made determined stand for law enforcement was fair and reasonable comment held for jury (Rev. St. 1925, art. 5432).

Newspaper article stating that district attorney had been able to convict a good many negroes and others when they pleaded guilty, but had not in a single instance made a determined stand for law enforcement, was imputation that he was derelict in duties and unfit for office for which he was candidate, and whether such comments were fair and reasonable, within Rev. St. 1925, art. 5432, under the facts was a question for jury.

14. Libel and slander ☞48(3)—District attorney, having criticized grand jury in newspaper, could not complain of publication of grand jurors' reply.

Where district attorney in newspaper article criticized grand jury for not returning indictments against alleged law violators, he could not complain of newspaper publication in which grand jurors made reply to his attack.

15. Libel and slander ☞48(3)—Newspaper article constituting true reproduction of speech made by opposing candidate for office of district attorney held privileged (Rev. St. 1925, art. 5432).

District attorney being candidate for re-election, publication in newspaper of speech made by an opposing candidate, stating that while district attorney was in office a white man was arrested in a negro house with a negro woman, and a Ku Klux Klan card found on him, and that district attorney ordered his release from jail without bond, was not actionable libel, since criticism of opposing candidate was privileged, under Rev. St. 1925, art. 5432, and facts stated by him were true.

16. Libel and slander ☞48(3)—Article asking whether people wanted their affairs dominated by men in secret halls held privileged as regards candidate for re-election on Ku Klux Klan ticket (Rev. St. 1925, art. 5432).

Newspaper article referring to district attorney, who was candidate for re-election on Ku Klux Klan ticket, asking whether people wanted to continue to have their affairs dominated by clique of men in secret halls or to have them restored to open control of all people, held privileged, under Rev. St. 1925, art. 5432.

17. Libel and slander ☞54—Publication that district attorney dismissed charge against fellow member of Ku Klux Klan being true was not actionable (Rev. St. 1925, art. 5432).

Publication in newspaper that charges against a justice of the peace were dismissed on motion of plaintiff district attorney, and that dismissal of charge was open to suspicion because district attorney and the justice of the peace were both Klansmen, being true, was not actionable, under Rev. St. 1925, art. 5432.

18. Appeal and error ☞1064(1)—Charge that several alleged libelous publications must be considered as a whole, each in light of the other, held reversible error.

In libel suit by district attorney against newspaper because of several defamatory articles appearing in newspaper at various times over a period of eight or nine months, charge that articles must be considered as a whole, and, when so considered, they were libelous as matter of law, and that plaintiff could recover thereon unless defendant proved truth thereof, was reversible error, where no actual malice was shown and several of the articles were not actionable, since each article, if libelous, constituted distinct cause of action and defendant had right to demand separate findings by jury thereon.

19. Libel and slander ☞112(3)—Proof of truth of statement to be defense must extend to every reasonable inference which may be drawn therefrom.

Proof of truth of alleged libelous publication must extend to every reasonable implication and inference which may be drawn from statements therein.

20. Libel and slander ☞124(6)—Court should have instructed jury to find whether comments or criticisms in newspaper respecting district attorney were reasonable and fair.

In libel suit by district attorney, who was candidate for re-election on Ku Klux Klan ticket, for alleged defamatory articles published in defendant newspaper, court should have instructed that fair comment published for general information was privileged, unless actual malice was proved, which should have been followed by instruction to have jury find whether comments and criticisms of plaintiff were under facts reasonable and fair.

On Motion for Rehearing.

21. Libel and slander ☞51(1)—Statements conditionally privileged are not actionable without proof of actual malice.

Statements conditionally privileged cannot be made basis of action for libel without proof of actual malice.

Graves, J., dissenting in part.

Appeal from District Court, Harris County; Ewing Boyd, Judge.

Suit by J. Dixie Smith against the Houston Press Company. From a judgment for plaintiff, defendant appeals. Reversed and remanded.

Fulbright, Crooker & Freeman and W. B. Bates, all of Houston (John H. Crooker, of Houston, of counsel), for appellant.

John M. Mathis, A. E. Heidingsfelder, W. M. Johnson, and Samuel Schwartz, all of Houston, for appellee.

LANE, J. This is a suit for libel brought by J. Dixie Smith against the Houston Press Company, with a prayer for damages in the sum of $50,000, which the plaintiff alleges he has suffered as a result'of the publication of certain defamatory articles, the first of which was published November 6, 1923, and the last in the fall of 1924.

The plaintiff was duly elected district attorney of Harris county, Tex. He was elected in 1922 on what was known as the Ku Klux Klan ticket. He was at the time of his election a member of the order of the Ku Klux Klan, and was a candidate for the same office as the Klan candidate at the primary election to be held in July, 1924, at which election he was defeated.

The Houston Press is a daily newspaper published and circulated by the Houston Press Company in Houston and vicinity. The alleged and proven publications of which the plaintiff complains were published in successive editions of the paper and the parts thereof particularly complained of, together with the matters leading up to their publication, may be explained as follows:

The articles complained of related to the handling of criminal cases pending before the court and the grand jury, and to the plaintiff, Smith, as district attorney, and to his candidacy for re-election during a heated campaign in which Smith was admittedly the Ku Klux Klan candidate.

The appearance of the first article complained of may be explained as follows:

While Smith was acting as district attorney, the grand jury made its report to Judge Robinson, judge of the criminal district court of Harris county, in which it was substantially stated that the officers charged with the enforcement of the criminal laws were derelict in the performance of their duties, and that such officers were not affording the grand jury such assistance as they should do. Smith says that he considered the report as a reflection on him. He testified that, about two months prior to the making of the grand jury report, he did, before an audience of 3,000 citizens of Houston, criticize the grand jury, which criticism was published by the papers. After the report of the grand jury was presented to the court, to wit, on the 5th day of November, 1923, Smith made a written statement which he caused to be published 'in the Houston Press, in which he said:

"Inasmuch as the retiring grand jury of Harris county has seen fit to severely criticize° me for what they claim to be a failure to render assistance and co-operate with them in their task of ferreting out violations of law, I feel constrained, in view of the personnel of said grand jury and their well-known attitude on several subjects, and in regard to some of the laws on our statute books, and especially the prohibition law, to completely ignore their re-

port, but in justice to the opinions of others, I deem it necessary to make a brief statement in reply to their caustic remarks concerning me personally.

"In the first place after 11 liquor cases had been submitted to the grand jury, and in each case a 'no-bill' was voted by them, and an attempt to refer same to the federal grand jury, in violation of their oaths as grand jurors, I went voluntarily before them in a spirit of helpfulness and offered to assist them in their work and to furnish additional information for their consideration, and was told that my offer was not appreciated, and not until after the public had been aroused to the point of indignation, and not until after the judge of the criminal district court of this county called them into the courtroom and again charged them that their failure to indict violators of the law, regardless of their personal views and opinions, was lending aid to anarchy, did they vote a true bill in any liquor case.

"Out of the liquor cases submitted to this grand jury, cases bound over to them from the various justice courts of this county, this grand jury failed and refused to indict in 51 cases submitted to them. In each of these cases, in my opinion, the evidence was sufficient to warrant an indictment and sustain a conviction. In no instance have they made any voluntary investigation of any liquor law violation in this county, so far as this office has been informed. On the contrary, investigators from this office have been denied admittance to the grand jury room when they desired to report violations of the liquor law, and a sheriff from an adjoining county with two witnesses failed to gain admittance to report violations of the liquor laws in Harris county about which they had valuable information. 'No-bills' were voted in some of the most flagrant violations of the law. One in particular was in the case of a man charged with selling whisky to several young boys. * * *

"The grand jury has completely failed in its report to point out a single specific instance of failure of the district attorney's office to assist them to run down violators of the law; on the contrary, I offered to do so and was virtually insulted by a member of the grand jury in the presence of the grand jury.

"If the public knew the number and character of cases 'no-billed' by this grand jury—and they may know if the newspapers will publish the justice court records—the people of this county will readily understand the variance of opinions of the grand jury and your district attorney.

"The grand jury has refused to indict a number of persons for driving automobiles on the public highways while in an intoxicated condition, notwithstanding several people have been injured by drunken men violating this law. These records are in my office and will be gladly shown to any one desiring to see them.

"Finally, I may add that it is passing strange that for the past two years the jury commissioners and grand jurors of Harris county have been selected from a particular class of persons, to the exclusion of the great mass of the people who have not had representation on that body.

"How long are the decent law-abiding people of Harris county going to tolerate such condi-

tions without registering their vigorous protest?

"Respectfully submitted,
"J. Dixie Smith,
"Criminal District Attorney, Harris County."

The first article published of which the plaintiff complains was published on November 6, 1923, and is a reply of five members of the grand jury who had been criticized by the plaintiff, the material parts of which are as follows:

"We have said in our final report to the court all that we care to say with regard to Mr. Smith's scandalous treatment of the grand jury. We could, of course, were we disposed to follow his example, and disregard our obligations to keep secret the proceedings of the grand jury room, say much that would prove of interest to the public, but we will not do that.

"Since, however, in his feeble effort to reply to our criticisms of him, he has uttered statements which are so unconscionably unfounded in truth, we are constrained to refute them.

"He states: That 'investigators from his office have been denied admittance to the grand jury when they desired to report violations of the liquor laws.' This accusation is miserably false. At no time were his investigators denied admission to the grand jury room. He says again, 'A sheriff from an adjoining county, with two witnesses, was denied admittance to report violations of liquor laws in Harris county, about which they had valuable information.' This accusation is wholly without foundation. No sheriff or other witness was ever denied that privilege. That, so far as he is informed, we returned no indictments against persons arrested for driving automobiles on the public highway while intoxicated. This statement furnishes another instance of his utter incapacity for accuracy. We did return several indictments for such offenses. In truth, in one or two instances only did we fail to indict and for the very persuasive reason that we were convinced the persons complained of were not guilty.

"During the closing hours of our term we summoned one of the investigators from the district attorney's office. In answer to our inquiry he informed us that his chief had not instructed him to investigate violations which he (Dixie Smith) frequently and in the public press, declared to be prevalent in the city of Houston. In this connection it is proper to say that, informed as he is of such violations, his failure promptly to institute criminal proceedings against the offending persons constitutes a flagrant dereliction of duty for which, in our opinion, he may be impeached.

" 'Dean Law.'

"He is also chargeable with a sinful and deliberate attempt to deceive the public into believing that we returned few, if any, indictments for violation of the 'Dean Law.'

"The records accessible to the public, we feel quite sure, will disclose that we returned a greater number of indictments for these offenses than did any preceding grand jury, including our immediate predecessors, whom he generously commended and who, we are certain, deserved unstinted praise for their able, conscientious, courageous, and successful exposure of a reign

of lawlessness, prevalent in Harris county during the incumbency of the present district attorney, and consistently ignored by him.

"Notwithstanding the mouthings of this inefficient and irresponsible political accident, we performed our exacting duties with courage, impartiality, and fidelity.

"Now, Jno. D., good-bye. As the philosopher said to the fly, 'Go poor worm, there's room enough in this world for you and I,' nor would we hinder your political dreams. You have not scored by your attacks upon a grand jury, but the future is open to all sorts of opportunities. This is a great state and a great nation, and many small men are being 'talked about' for great offices. Go to it—be not discouraged—remember George Washington was once a man of your age.

"[Signed]     R. M. Johnson,
"L. H. Bailey,
"M. F. Hammond,
"A. F. Foster,
"Dave Fitzgerald."

Owing to the large number of articles complained of, we shall give them consecutive numbers and try to condense them by giving their substances:

No. 2 is in effect a statement that there was a dispute between Judge Robinson and John D. Smith which had developed into a nasty political row; that the district attorney was making it apparent that he did not intend to co-operate with future grand juries any more than he had with the one which had censured him in its report; that it had become a question as to which should go, the district attorney or the judge; that it was the opinion of the Press that the district attorney could be spared without harm to the county; that it was of the opinion that Smith had in ten months not demonstrated any particular fitness for the post to which he was elected, but, on the other hand, Judge Robinson had been on the bench for more than 13 years, and that during such time he had shown that he was perfectly capable as a judge, and that no previous district attorney had found fault with him, but that John D. Smith now presumes to tell the people that the judge plays politics, picks grand juries from only a small group of citizens, and generally behaves in such way that he ought to be impeached; that common sense would suggest that it was more reasonable to keep an official with 13 years' experience than one with less than a year's experience, especially when the newer man had spent most of his time in getting himself into hot water and extricating himself with poor grace; that Judge Robinson has never been accused of being dominated by any creed or group of citizens, but, on the other hand, Smith boasts of his membership in an organization which requires of its members an oath that supersedes his oath as a public official; that on one side we have a jurist whose ability is unquestioned, who is free from outside influences, and who has served faithfully for

13 years, and, on the other hand, we have an upstart in public office, a district attorney with less than one year's experience, pledged soul and body to the Ku Klux Klan, and who has committed many acts that stamp him as being unfit for office; and that justice in Harris county is going to be a matter of politics unless one or the other goes.

No. 3, of date April 24, 1924, in which this inquiry is made:

"Have you noticed J. Dixie Smith or the district attorney's office doing anything to help solve the mystery of the Webster avenue fire?"

The article then proceeds to say, substantially, that Smith wrote the fire investigation committee a letter, in which he refused to make an autopsy of the dead girl to see if some traces of murder could be found; that the mystery evidently involved a double murder and arson, but the district attorney's office had taken no part in the investigation; that it refused the request of officials to take part; that one of the sworn duties of the district attorney was to enforce the law and that he could not do this without gathering evidence; that Smith has in his office a man devoting his time to trying to gather evidence on violations of the anti-trust law; and that there are some big fees in that.

Explanatory of the last publication and another to follow, we will here state that there was a fire on Webster avenue in Houston, which destroyed a house, and in which two persons lost their lives, or were murdered, and their bodies left in the house before the fire. After this fire, Jack Warren and Miss Patterson were charged with murder and arson. It was being insisted that the district attorney have an autopsy held over the bodies mentioned. The district attorney refused to order the same held, but wrote Mayor Holcombe the following letter:

"Houston, Texas, April 22, 1924.

"Hon. O. F. Holcombe, Mayor, Houston, Texas.—Sir: So far as this office is concerned, it is perfectly agreeable for an autopsy to be held over the bodies of Miss Patterson and Mr. Flagler, who met death in the fire at 1619 Webster avenue at 3 a. m. this date.

"Yours very truly,
"[Signed]    J. Dixie Smith,
"Criminal District Attorney."

No. 4 was published in the Press on May 2, 1924, and those parts complained of were as follows:

"The manner in which Police Chief Goodson, Justice Campbell Overstreet, and District Attorney John D. Smith secretly quashed the Warren Case in justice court is open to considerable criticism.

"Not only was the hearing quashed but other attempts to hide the facts have been apparent in this investigation. Such secrecy is to be expected in Klan Hall at Milam street and Capital avenue. It is not needed in our law machinery, however, where the lives of citizens are at stake.

"If immunity is granted to Miss Evelyn Patterson, and it appears now that no other course can be followed, the grand jury is responsible. John D. Smith, district attorney, is placed in an embarrassing position because of this. Miss Patterson is a Catholic. Smith is a Klansman. If Smith grants immunity to a Catholic, his Klan friends will make things hot for him at Klan Hall—and the general public will criticize him also. If he fails to grant her immunity, the cases against Warren and Miss Patterson will likely all collapse and Smith will be blamed.

"Not a very comfortable position for a district attorney to be in. Yet it is to be expected with a man pledged to a secret society in office."

No. 5, May 3, 1924:

"The Ku Klux Klan saved Bob Robinson, charged Mrs. Crow.

"When I got back from Kountze last week, a Klansman came to me and said: 'The Ku Klux Klan saved Bob, but, so help me God, I will never vote for any other Klansman for any office.' Bob is a Klansman and the son of a Klansman."

### "The Search Light.

"The Klan has given us a district attorney who, most observers believe, is a signal failure. He has been able to convict a good many negroes and others when they pleaded guilty. There is not a single instance where he had made a determined stand for law enforcement."

No. 6 is a reproduction of a speech made by A. C. Winborn on April 22, in the political campaign of 1924:

"Your district attorney claims to be a great moral reformer. He belongs to an organization that boasts of white supremacy and talks loud about separation of blacks and whites, but do you know that since he has been in office a man from Navasota was arrested in a negro house with a negro woman? Justice Campbell Overstreet fixed his bond at $400.00. They put him in jail and when they searched him, they found a yellow card showing he was a member of the Ku Klux Klan. Dixie Smith came to the jail and ordered his release, although he made no bond. Overstreet got on the telephone and called up Smith and asked him what he meant by such action. Bob Martin, night police chief, was on an extension phone. Dixie said the man was a good Klansman and they should stand by him."

No. 7, July 24, 1924:

"But let's forget all that and get to the issue. It is simply whether the people want to continue to have their affairs dominated by a little clique of men in secret halls, or whether they want to restore it to the open control of all the people. There is not any other issue.

"They are asking you to return them to office and along with them   * * *   Dixie Smith, who has made a corpse out of the district attorney's office. They want the voters to kick out Judge C. W. Robinson and Judge J. D. Harvey, two of the most able jurists in the state, and put in their place a couple of incompetents. Only by defeat of the whole Klan crown can we have a return of peace in this county."

To explain the excerpt below quoted, we will here state that in article No. 5 it was stated that Mrs. Crow had said her sister, Mrs. Dudley, who was killed by Bob Robinson, was not as black as painted; that Bob loved her sister, had asked her to marry him, and when she refused, and when he found out that she was going to marry another man, he shot her.

"That would have given a motive for this strange killing, but the district attorney in the trial of the case barely proved that Mollie Dudley had been slain by Robinson. * * * Bob Robinson and his father were both Klansmen. They were prosecuted by a Klan prosecutor."

No. 8, August 1, 1924:

"Justice W. N. Williams has escaped trial on charges of extortion for which he was indicted in October. The charges were dismissed by Judge C. W. Robinson yesterday on motion of District Attorney John D. Smith.

"When a district attorney goes into court and says that evidence is insufficient, it means that he does not want to try a case. He assumes the prerogative of a jury by passing on testimony without submitting it in open hearing.

"In view of the fact that Smith and Williams are both Klansmen, this dismissal of charges against Williams at Smith's request is open to suspicion."

We have examined the record of 450 pages, and the statement of facts of 473 typewritten pages, and have done our best to quote the material parts from the several articles complained of, and not stricken out by the trial court.

The plaintiff alleged that each of these articles complained of was false, etc., and, when considered alone and in connection with the others, charged and imputed to him certain base, corrupt, and improper motives in the performance of his official duties as district attorney, and that he was possessed of a vicious, ignorant, intolerant, narrow, corrupt, and prejudiced mind. He further alleged generally that, in publishing each and all of said articles, defendant "acted in pursuance of a systematic, studied, deliberate, and premeditated design and purpose to injure and damage plaintiff."

The defendant answered by general demurrer, by numerous special exceptions, a general denial, a plea alleging the truth of the articles complained of, a plea of qualified privilege and belief of the truth of the statements in the several articles, and by plea of denial of malice.

The case was submitted to a jury upon special issues preceding the submission of which the court gave the following instructions:

"The articles set out in plaintiff's petition and which have been introduced in evidence must be considered as a whole, each in the light of the other, and when so considered they are libelous as a matter of law and the plaintiff is entitled to recover such actual damages as you may believe he has suffered, in any event, some damages unless the defendant has proven the truth thereof.

"If the defendant has proven the truth of part of such statements, then as to such part no damage has resulted as a matter of law and you can only consider damages as to such statements as, in your opinion, the defendant has failed to prove to be true.

"The proof would not have to be literally true, but would be sufficient if it substantially verifies the material statements and their necessary imputation and inference."

The special issues and the answers of the jury thereto are as follows:

"(1) Were the material statements of the defendant concerning the plaintiff, as set out in plaintiff's petition, true? Answer: No.

"(2) What sum of money, if paid now * * * in cash, would fairly and adequately compensate him by reason of the publication of such articles as you have not found to be true? Answer: $3,000.

"'Actual malice,' as that term is used in law, means an unlawful act, willfully or wantonly done, without reasonable ground for believing it to be lawful, or an act recklessly or inconsiderately done.

"Actual malice may be inferred from ill will, grievances, and altercations between parties, or from reckless disregard of the rights of the party against whom statements are made, or from evidence of strong political feeling.

"Actual malice cannot be inferred alone from the fact of publication, nor from the falsity thereof, but must be proven as any other fact from all the facts and circumstances in evidence.

"Having in mind this definition of actual malice, you will answer the following issues:

"Special issue No. 3: Was the defendant actuated by actual malice in the publication and circulation of the articles complained of, and not found by you to be true, if any? Answer: No."

Upon the answers of the jury to such special issues the court rendered judgment in favor of plaintiff against defendant for the sum of $3,000, with interest thereon, and for costs, and from such judgment the defendant has appealed.

[1] By its first group of propositions, appellant presents the contention that the undisputed evidence shows that the material statements made in the articles complained of are either substantially true or qualifiedly privileged; that the jury, in response to a proper issue submitted, found that defendant was not actuated by malice in publishing and circulating said articles, and that, under such showing and finding of the jury, the verdict of the jury that the material statements made by defendant are untrue should be set aside by this court and judgment be here rendered for appellant.

We are not prepared to reverse the judgment upon the contentions above stated.

We are of opinion that articles 2, 3, 4, and 5 contained statements libelous per se, and unless such statements are shown to be true, or shown to be privileged under those provi-

sions of article 5432 of our Civil Statutes, which provide that the publication of a fair, true, and impartial account of public meetings, organized and conducted for public purposes only, and the publication of a reasonable and fair comment or criticism of the official acts of public officials and other matters of public concern, published for general information, shall be deemed privileged and shall not be made the basis for any action for libel, without proof of actual malice, appellee would be entitled to a recovery of at least nominal damages. The contentions of appellant above stated are overruled

The publication of the articles complained of having been proven by the undisputed evidence, the questions to be determined are: (1) Were any of the published statements shown to be true; if so, which ones? (2) Were any of such statements privileged or qualifiedly so; if so, which ones?

[2-5] In discussing these · inquiries we shall, in view of the finding of the jury that the publications were made without malice, assume that the publications were in fact made without malice. A reasonable and fair comment or criticism of official acts of public officials and other matters of public concern, published for general information, is, under our statute, privileged and forms no basis for an action for libel without proof of actual malice. Whether a publication is a reasonable and fair comment or criticism is, we think, a question to be determined by the jury from the evidence. While it is true the right to criticize does not embrace the right to make false statements of facts, to attack the private character of a public officer, or to impute to him malfeasance or misconduct in office, comment on and criticism of the acts and conduct of public men are privileged if fair and reasonable and made in good faith. It is also true that when a man becomes a candidate for office his character for honesty, integrity, and matters which surround him which are calculated to affect his qualification and fitness for office are put before the public and are proper subjects for fair and reasonable comment. In Cyc. pp. 401 to 405, it is said:

"The interest of society requires that immunity should be granted to the discussion of public affairs and that all acts and matters of a public nature may be freely published with fitting comment or strictures."

Again:

"In some jurisdictions * * * it is held that, even though the statements are not strictly true, defendant is not liable if there' was probable cause for the statement and there is no proof of express malice."

[6] Using as a basis the rules above announced, we shall proceed to a discussion of the theory upon which we hold that the evidence raises the issue as to whether the statements made in articles 2, 3, 4, and 5 form the basis for a cause of action for libel. In such discussion it must be kept in mind that appellee, Smith, was, at the time of the several publications, district attorney, and a candidate for re-election to the same office on the Ku Klux Klan ticket.

The only statement in article 2 upon which a cause of action could possibly be based are the statements: (1) That *Smith boasts of his membership in an organization which requires of its members an oath that supersedes his oath as a public official;* and (2) that he was *pledged soul and body to the Ku Klux Klan, and committed many acts that stamp him as being unfit for office.*

While we think the jury might have found that the statements made in article 2 were not a reasonable and fair criticism of an officer and a candidate for office, they would have been supported by the evidence in a finding that such statements were both a reasonable and fair criticism, had such issue been submitted.

[7] By article 3 the statement is made that evidently a double murder and arson had been committed, and that the district attorney's office had taken no part in the investigation; "that it refused the request of officials to take part; that one of the sworn duties of the district attorney was to enforce the law; * * * that Smith has in his office a man devoting his time to trying to gather evidence on violations of the anti-trust law; and there are some big fees in that."

We think the statements impute to appellee dishonesty and corruption and that, unless proven true, they form the basis for an action for libel.

[8, 9] By article 4 the charge is made that Police Chief Goodson, Justice Campbell Overstreet, and District Attorney Smith secretly quashed an indictment against one Jack Warren, and stated that such act was open to criticism; that said parties attempted to hide the facts disclosed by an investigation. The further statement was made that "such secrecy is to be expected in Klan Hall. * * *" It is inferably stated that Miss Patterson, who had been jointly charged with murder and arson with Jack Warren, was offered immunity by the grand jury so that she could testify against Warren, and that Smith blocked the granting of such immunity. Commenting further, it is said:

"John D. Smith, district attorney, is placed in an embarrassing position because of this. Miss Patterson is a Catholic. Smith is a Klansman. If Smith grants immunity to a Catholic, his Klan friends will make things hot for him at Klan Hall—and the general public will criticise him also. If he fails to grant her immunity, the cases against Warren and Miss Patterson will likely all collapse and Smith will be blamed. Not a very comfortable position for a

district attorney to be in. Yet it is to be expected with a man pledged to a secret society in office."

Such charges are clearly libelous per se, and, unless proven to be true, are sufficient upon which to base an action for libel. The truth of the statement or statements, however, in such publications constitute a defense to such action unless it be shown that such publications were prompted by actual malice.

[10, 11] The rule which we think should be applied in suits based upon publications such as are here being discussed is so well stated by appellant that we adopt the same as our own, as follows:

"Where the criticism is of and concerning the acts of a public official or a candidate for public office, the rule is quite different and more lenient than it is where the criticism is of a private individual or of a public official or candidate for office in his private life. The law in this regard has been clearly stated by the Supreme Court in the cases of Nunn v. Webster [Tex. Com. App.] 260 S. W. 157; Cotulla v. Kerr, 74 Tex. 89 [11 S. W. 1058, 15 Am. St. Rep. 819]; Express Printing Co. v. Copeland, 64 Tex. 354; Belo & Co. v. Wrenn, 63 Tex. 686 —where it was held that any criticism of the official acts or conduct of a public official, or of a candidate for a public office, or concerning his fitness and qualifications for the same, is privileged and cannot be made the basis of a suit for libel, without showing actual malice, unless the charge is of such a nature as to be ground for removal from office, such as the charge of corruption of office, or the committing of an offense which would be ground for removal. If the criticism or charge made against the official is of such a nature as to be ground for removal from office, the truth is the only defense." Express Publishing Co. v. Keeran (Tex. Com. App.) 284 S. W. 913.

In Cotulla v. Kerr, above cited, Justice Henry, speaking for our Supreme Court, said:

"When a libelous publication relates to a person in office it may affect him in his personal or official character. * * * If it applies to him as an officer the better opinion seems to be that to make it actionable per se the charge must be of such a nature that if true it would be cause for his removal from office."

[12] It has been held, however:

"That newspapers are not held to the exact facts, nor to the most minute details of the transactions they publish. What the law requires is that the publication shall be substantially true and mere inaccuracies not affecting materially the report of the article are immaterial." 36 Corpus Juris, 1273.

[13] By No. 5 it is stated that Smith had been able to convict a good many negroes and others when they pleaded guilty but he had not in a single instance made a determined stand for law enforcement.

It seems to us that such statement is an imputation that Smith was derelict in the performance of his sworn duties and unfit for the office he held, and to which he was aspiring. We think that whether such comments were fair and reasonable comments under the proven facts was a question to be determined by the jury upon proper instructions.

Had the questions as to the truth of the statements complained of in the several articles 2, 3, 4, and 5, and as to whether or not they were, under the facts and circumstances shown, privileged as provided by our statutes relating to libel, been submitted to the jury and the jury had found that any of them were untrue and that they were not privileged we would not hold that there was no evidence to support such findings and the judgment rendered thereon. But no such questions were separately or otherwise submitted. After the court had instructed the jury that all of the articles complained of in the plaintiff's petition must be considered as a whole, each in the light of the other, and when so considered they were, as a matter of law, libelous, and that the plaintiff was entitled to recover some damages unless the defendant has proven that all were true, he then submitted the only question as to whether or not the material statements made in the articles as a whole concerning defendant were true, ignoring the question as to whether said articles, or any of them, under the facts proven, were privileged under the law.

We shall now proceed to a consideration of articles 1, 6, 7, and 8.

[14] We have already shown that article No. 1 was a reply of certain members of the grand jury to a vicious attack made on the grand jurors and the criminal district judge by appellee, Smith, whereby Smith charged the grand jurors and the judge with having violated their oaths of office and attributing to them certain base and corrupt motives and acts. At the request of appellee, Smith, the Houston Press published that attack made by him on the grand jurors and the judge. The grand jurors made reply to the attack made through the forum chosen by appellee. Under such circumstances, appellee should not be heard to complain that he had the worst of the fray invited by him.

Newell on Slander and Libel, p. 456, § 429, says:

"Every man has a right to defend his character against false aspersion. It is one of the duties which he owes to himself and his family. Therefore communications made in fair self-defense are privileged. If a person is attacked in a newspaper, he may write to the paper to rebut the charges, and may at the same time retort upon his assailant, where such retort is a necessary part of his defense or fairly arises out of the charges he has made. A man who commences a newspaper war cannot subsequently come to the court as plaintiff to complain that he has had the worst of the fray."

The text cites, among other cases, the case of Laughton v. Bishop of Sodar and Man, L. R., 4 P. C. 495, 42 L. J. P. C. 11. In this case:

"The plaintiff, a barrister, attacked the Bishop of Sodar and Man before the House of Keys, in an argument against the private bill imputing to the bishop improper motive in the exercise of church practices. The bishop wrote a charge to his clergy refuting these insinuations and sent it to the newspapers for publication. Held, that under the circumstances the bishop was justified in sending the charge to the newspapers, for an attack made in public requires a public answer."

[15] As already stated, it is shown by the undisputed evidence that article 6 is a true reproduction of a speech made by one A. C. Winborn in opposing the candidacy of appellee, Smith. In that speech the speaker said, substantially, that appellee claimed to be a great reformer; that he belonged to an organization that boasts of white supremacy and talked loud about separation of blacks and whites; but notwithstanding such claims while in office as district attorney, a white man was arrested in a negro house with a negro woman; that Justice of the Peace Overstreet fixed his bond at $400; that he was put in jail; that when they searched him they found a card showing that he was member of the Ku Klux Klan; that appellee, Smith, went to the jail and ordered his release without bond; that Overstreet asked Smith what he meant by such action, and Smith replied that the man was a good Klansman and they should stand by him. Winding up his speech, Winborn asked:

"Now what do you think of that for a good Klansman who boasts of his great morality? Are you in favor of that sort of thing?"

Testifying with reference to the subject mentioned in Winborn's speech, Overstreet said that he was elected on the Klan ticket; that he remembered the incident of the arrest of the man; that the man was a justice of the peace at Navasota; that the man was charged with vagrancy and lying in bed with a negro woman; that he fixed his bond at $200; that, when he learned that the man had been released, he complained of such action, and was told that District Attorney Smith had said to take a check for $15.60 and release the man; that he called Smith and asked him by what authority he had released the man; and that Smith replied:

"Now, Campbell, this man is from Navasota, and all the boys up there are members of the Klan."

Appellee testified as follows:

"This man from Navasota was caught in bed with a negro woman by one of my men and a deputy sheriff. I went down to jail the next morning, which was Sunday morning. The men that went to jail with me were Klansmen. I did not know Franklow was a Klansman. He might have been. Perhaps the jailer had no authority to accept the minimum fine as a bond, and in doing so he violated the law. I merely agreed to it, and it was what they had been doing before. Whatever the fine amounted to I agreed to let him go on it. I did it to befriend a friend [Hugh Woods, who was a Klansman] and to keep his family from disgrace."

It is shown by the undisputed evidence that the publication was true and we think the criticism made by Winborn as published was, under the circumstances, privileged, and forms no basis for a suit for libel.

[16] As to article No. 7, we think it was clearly privileged, and therefore forms no basis for a cause of action.

[17] The statement made in No. 8 is shown by the evidence to be true and forms no basis for a suit for libel.

[18] We are now brought to a consideration of appellant's complaints of the charge of the court. As already shown, the court charged the jury that:

"The articles set out in the plaintiff's petition, and which have been introduced in evidence, must be considered as a whole, each in the light of the other, and when so considered they are libelous as a matter of law and the plaintiff is entitled to recover such actual damages as you may believe he has suffered; in any event some damages, unless the defendant has proven the truth thereof."

And followed such charge with the submission of the following special issue:

"Were the material statements of defendant concerning the plaintiff, as set out in plaintiff's petition, true?"

Appellant contends that the court erred in combining all the articles which were published on different dates, extending over a period of about eight or nine months, as constituting one cause of action and requiring the jury to consider the several publications together, each in the light of the other, in that publications concerning a person made at different dates, about different matters and things, even if libelous, are separate and distinct libels which could not be properly pleaded as forming one cause of action; that each count must stand or fall separately and alone and independently of the others.

Appellant complained of the manner in which the cause was submitted and requested that the truth of the several articles be submitted separately.

We think the contention should be sustained. None of the articles were published with actual malice. We cannot conceive how some of the articles, especially articles 1 and 6, could have formed any part of a basis for an action for libel, but the jury, under the instructions of the court and in answer to special issue No. 1, found that the material statements complained of, as set out in the plaintiff's petition, were not true, and upon

such omnibus finding judgment was rendered for appellee.

The several articles could not be considered together as a whole, as showing an attempt on the part of the appellant to destroy appellee, for the jury found that appellant had no such malicious intention; that is, that the articles were published without malice. Each of the alleged articles must stand alone, and, if libelous under the law, it constitutes a separate and distinct cause of action, and in such case the defendant had the right to demand separate findings on each article. Conran v. Fenn (Mo. App.) 140 S. W. 82; Olympia Waterworks v. Mottman, 88 Wash. 694, 153 P. 1074; Pfister v. Milwaukee Free Press Co., 139 Wis. 627, 121 N. W. 938; McCauley v. Elrod (Tex. Civ. App.) 27 S. W. 267; Panhandle & S. F. R. Co. v. Tisdale (Tex. Civ. App.) 199 S. W. 347; Id. (Tex. Com. App.) 228 S. W. 133.

In the case of Conran v. Fenn, supra, it was held that a petition, in an action for slander, is bad where it alleges in one count a number of separate slanders at different times and places to different persons; each separate statement being a separate cause of action.

Under the charge of the court and the findings of the jury in answer to the special issues, how is appellant to know which of the articles the jury found to be true? How is it to know what statements the jury found to be material and what ones they found to be immaterial, if any? We are unable to determine which particular one or more of the publications the jury found to be untrue, or to determine what statement or statements, if any, were found to be material.

Townsend in his work on Slander and Libel (4th Ed.) § 291, says:

"Where there are several counts, and a verdict is entered generally on all the counts, and general damages are given, if one count is bad, the judgment will be arrested, and a venire de novo awarded. But if the judge who tried the cause certifies that the evidence applied only to the good counts, or it is otherwise apparent that the defective count has not influenced the amount of the verdict, the verdict will be amended by confining it to the good counts. Where there is any doubt as to any one count, it is prudent to have the damages assessed severally, or to abandon the doubtful count, and take a verdict on the other counts only. By a defective count is meant a count which shows no cause of action."

[19] We also sustain appellant's complaint of so much of the court's charge as instructed the jury that "the proof of the truth of the statements to be a defense must extend to *every* implication and inference which may be drawn from the statements," instead of instructing them that such proof must extend to every *reasonable* implication and inference which may be drawn from the statements. The charge should have been so limited, as suggested by defendant.

We have examined such of appellant's assignments as we have not discussed, but as the errors complained of are not, in our opinion, causes for reversal of the judgment and will not likely occur upon another trial, we will not enter into a detailed discussion of them here.

[20] We think the court should have instructed the jury that a publication of a reasonable and fair comment and criticism of the official acts of officers and other matters of public concern, published for general information, are privileged under the law and could not be the basis of an action for libel, without proof of malice on the part of defendant, and should have followed such instruction with the inquiry to the jury as to whether or not the comments and criticisms made of the plaintiff in articles 2 and 5 were, under the facts and circumstances, shown to be reasonable and fair.

Having reached the conclusion that the court committed reversible error in the manner of submitting the cause to the jury, as pointed out, it becomes our duty to reverse the judgment and remand the cause, and it is so ordered.

Reversed and remanded.

GRAVES, J. (concurring). While concurring in the reversal ordered for the errors pointed out in the trial court's charge, I am unwilling to be committed to the rest of this court's opinion, since it seems to me to be confusing and inaccurate in its statement of the law of libel as applicable to a case of this particular kind; that is, one in which the matters declared upon, in part at least, are found to be libelous per se because plainly aspersive of the character and motives of a public officer and candidate. After so classifying articles 2, 3, 4, and 5—each and all—in which characterization I fully agree, the opinion declares that the question of whether or not 2 and 5 were privileged under article 5432 as being reasonable and fair comments and criticisms still remained as an issue of fact that should have been, under appropriate instruction, submitted to the jury for determination.

That is not my conception of the law in such an instance; in other words, I understand our Supreme Court in the recent case of Belo v. Looney, 112 Tex. 160, 246 S. W. 777, the decision in which it later expressly approved in Express Publishing Co. v. Lancaster (Tex. Com. App.) 285 S. W. 810, neither of which are cited in appellant's brief or in this court's opinion, to hold that newspaper publications concerning a public official—whether of original or of quoted matter—which impute to him moral delinquency in private character, or corrupt motives in official conduct, are as a matter of law not privileged as "fair, true and impartial accounts of public meetings" or "reasonable and fair comments or criticisms of the official acts

of public officials" within the meaning of R. S. art. 5432, subds. 3, 4, but are libelous per se as statements of fact, as such import malice, and to be excused must be proven to be true by the publisher.

The court, in the Looney Case, couched its holding in these, among other terms:

"We think the great weight of American authority is to the effect that false statements of fact concerning a public man, or the imputation to him of corrupt motives, is not privileged as fair comment. Possibly this doctrine was never better stated anywhere than by the Supreme Court of Maryland in the case of Negley v. Farrow, 60 Md. 158, 45 Am. Rep. 715, where the following expression is found:

" 'There is a broad distinction between fair and legitimate discussion in regard to the conduct of a public man and the imputation of corrupt motives by which that conduct may be supposed to be governed; and if one goes out of his way to asperse the character of a public man and to ascribe to him base and corrupt motives, he must do so at his peril, and must either prove the truth of what he says or answer in damages to the party injured. * * * '

"The foregoing proceedings, found in the legislative journals, are very persuasive that the Legislature declined to sanction a law authorizing attacks upon the motives of public officers. The same act preserved to defendants all defenses existing at common law, but, as we have already indicated, we believe the correct common-law doctrine did not sanction the unfounded imputation of moral delinquency with reference to the private character of public officials or the motives which actuate their public conduct. To make a statement that a public officer is actuated by evil or corrupt motives in a public undertaking is to make a statement of fact, and such statement of fact should be justified like any other statement of fact, in order to exonerate the person making the statement. * * *

"If, on the other hand, these resolutions impute bad motives to the appellee, they would not be privileged as comment, and if thus libelous, their publication would not be excused when that ground of defense is invoked. It would be wholly inconsistent to hold the press responsible as a wrongdoer for doing one thing when it acted as a commentator or critic, and protect it as performing a high duty to the public when it did substantially the same thing as a purveyor of news. Assuming that this meeting was called for public purposes, yet when it ascribed to appellee reprehensible purposes, and charged him with a willful design in bringing his suit to seek a place where he might work out an injustice, it departed from the field of protection afforded by the statute, and was no longer engaged in the furtherance of public purposes, and the benefit of the statute did not extend to the publication of such proceedings."

To the same general import is the holding of the Texarkana Court of Civil Appeals in C. Bruce Ferguson v. Houston Press Co., 1 S.W. (2d) 387, where this is said:

"In conclusion, we are of the opinion that the court erred in the ruling only so far as pertains to publications referred to herein as eighth and ninth articles. That publications respect-

ing public officers are in a measure privileged is recognized by the weight of authority and the statute. There must be freedom of fair comment and criticism, made in good faith and without malice, upon facts that are true, of the integrity and misconduct of public officers as such. It is of public concern and in public interest. The privilege, however, of discussion in such cases does not extend to the making of false statements of fact, even though made in good faith and with reasonable cause to believe it true. The statement of fact published must be true in all respects."

Agreeably to the principle thus enunciated, since the circumstances of their publication were undisputed and all the above-enumerated articles did so carry these nonpermissible imputations, I think it was the province of the court to determine that they were not privileged in the circumstances (37 Corpus Juris, "Libel and Slander," p. 196, § 553), and to submit to the jury the question whether or not they were true as the only defense available against them.

The other articles 1, 6, 7, and 8 are likewise subject to the same principle, but under the particular facts appertaining to each of them, I am not prepared to hold that they are brought within it, or to differ from this court's classification of them.

### On Motion for Rehearing.

LANE, J. [21] Counsel for appellee has filed a motion for rehearing and therein our attention is called to the fact that in our original opinion we said:

"The truth of the statement or statements, however, in such publications constitute a defense to such action *unless it be shown that such publications were prompted by malice.*"

Commenting upon the above statement, counsel said:

"We are unaware of any authority which lays down the rule here announced by this court. The Texas statute expressly provides that 'the truth' of the statement or statements, in such publication, shall be a defense to such action (Vernon's Ann. Tex. Stat. art. 5431). Such defense is unqualified and absolute."

We concede that the criticism is well founded. What we should have said was that statements conditionally privileged could not be made the basis of any action for libel without proof of actual malice. The writer, when making the criticized statement, must have had in mind the provisions of article 1269 of the Revised Criminal Statutes of 1925 (Code Cr. Proc.), which defines libel as follows:

"He is guilty of 'libel' who, with intent to injure, makes, writes, prints, publishes, sells, or circulates any malicious statement affecting the reputation of another in respect to any matter or thing pointed out in this chapter."

With the explanation made, we refuse the motion.