**EVANS v. HOUSTON PRINTING CORPORATION.**

No. 12022.

Court of Civil Appeals of Texas. Galveston.

Dec. 2, 1948.

Rehearing Denied Jan. 27, 1949.

1. Appeal and error ⚯1052(8), 1068(3)

T. G. Schirmeyer, of Houston (Franklin, Kelly & Fellbaum, of Houston, of counsel), for appellant.

Frank J. Knapp and W. N. Blanton, Jr., both of Houston (Butler, Binion, Rice & Cook, of Houston, of counsel), for appellee.

GRAVES, Justice.

This was an action for damages for alleged libel, brought by appellant, Thomas E. Evans, as plaintiff, against appellee, the Houston Printing Corporation, as defendant, arising out of the publication by appellee of two articles in its newspaper, The Houston Post, on August 8, and 9, 1946, respectively; judgment was rendered for appellee, upon appellee's motion for judgment, after the jury had been discharged without reaching agreement.

Such judgment was based upon the trial court's conclusion that an instructed verdict should have been granted, because, under the undisputed evidence, the article of August 8th could not either directly, or by innuendo, be construed as libelling appellant; that the truth, or substantial truth, of all material statements which were alleged to have been libelous, was established as a matter of law; and that such articles were privileged.

Appellant's points-of-error for a reversal, as briefed and indexed by him, are these:

"Point I—The trial court erred in granting defendant's motion for a directed verdict and motion for judgment.

"Point II—The articles are libelous.

"Point III—The articles are not true and substantial truth is not an absolute defense.

"Point IV—The articles are not privileged.

"Point V—The entire U. S. Coast Guard record should have been admitted in evidence.

"Point VI—Trial court did not properly charge the jury."

■ In limine, it is obvious from a reading of Points V & VI that neither of them presents anything for review here, because they deal only with alleged errors of the court, (1) in not permitting certain testimony to go to the jury, and (2) in improperly charging it.

Since, as indicated, the jury was discharged and the whole cause decided by the court itself as if following an instructed verdict, these complaints are no longer material.

■ The first four points, however, going as they do to the expressed ground upon which the trial court held that an instructed verdict would have been proper, may be disposed of together, since they raise the only overall question of law to be determined by this Court, to-wit:

Did the pleadings and evidence for the appellant raise any material issue-of-fact for the jury?

In other words, the test is whether or not the court could "render the judgment, if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff." Wininger v. Ft. Worth & D. C. R. Co., 105 Tex. 56, 143 S.W. 1150.

See also: Coca-Cola Bottling Co. v. Burgess, Tex.Civ.App., 195 S.W.2d 379, at page 381; Sec. 15, Art. I, Texas Constitution, Vernon's Ann.St.; Johnson v. Moody, Tex. Civ.App., 104 S.W.2d 583, at pages 584, 586; Ferguson v. Houston Press Co., Tex. Civ.App., 1 S.W.2d 387, affirmed by Tex. Com.App., 12 S.W.2d 125; Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377, Pars. 6 and 7.

The appellant had declared-upon the two articles so forming the basis of his suit, had at length alleged all of them to be libelous as against himself, and had attached exact copies thereof to his trial-petition, as exhibits "A" and "B" thereto.

Like copies of the same documents are also attached to this opinion, under the same exhibit numbers.

Appellant further had alleged their publication and circulation by the appellee in due course of printing and mailing out its "Houston Post" to its entire clientele in Harris County, where it was published, as well as elsewhere;

He had also supported his claimed cause-of-action arising out of such publications by the appellee with extended testimony upon his side.

Whereupon, the appellee, in its turn, after in effect conceding its issuance, publication, and circulation of such two articles substantially as charged by the appellant as to such procedural acts, denied that either of them had been libelous as claimed by the appellant, or in any respect injurious to him, and further asserted: (1) That the truth, or substantial truth, of all material statements, which he had so alleged to have been libelous against him, had been established to be true as a matter of law; (2) that they had all been privileged under the law, Vernon's Texas Civil St.1948, Art. 5432, subds. 1 to 5, inclusive, hence had not been susceptible of being libelous toward the appellant.

■ The trial court, after having first submitted to a jury in some 16 special-issues what it at that time deemed to have been the questions-of-fact raised by the pleadings and the evidence from both parties in the controversy, and after having discharged a jury, which had failed to agree thereon, as above recited, at that stage granted the appellee's motion therefor and rendered the judgment here at bar for the appellee.

In doing so, the court at length set out in support of its final judgment, findings-of-fact and conclusions-of-law.

These are too long for copying or extended quotation here, but it is evident therefrom: (1) That many, if not all, of the controlling ones of the fact-findings were drawn exclusively from the appellee's evidence upon the trial; (2) that the conclusions-of-law deduced therefrom to the effect, (a) that the article of August 8th did not libel the appellant; (b) that the one of August 9th was a privileged publication by a newspaper of a fair, true, and impartial account of official proceedings, pursuant to Vernon's Texas Civil Statutes, Art. 5432, Subdivisions 1 to 5, inclusive; (c) that the August 9th article was further privileged as a fair, true, and impartial account of a public meeting dealing with public purposes, based on Subdivision 3 of such

Art. 5432; and (d) that all the statements contained in both articles "which could possibly constitute a libel of the plaintiff were established as a matter of law," were expressly by the court "based upon paragraphs 8, 9, and 10, of the above findings-of-fact."

It seems clear to this Court that in so proceeding, the trial court erred, and that it should have refused the appellee's motion for judgment in its favor, and granted a new trial; the cause was still a jury case, in which the court could not, in the stated circumstances, deprive the appellant of the right to a jury-trial guaranteed him by Section 15, Article 1, of the Constitution of Texas.

■ As this Court understands the state of our decisions, the rule above quoted, under which alone a cause may be so taken from the jury, is the same, whether the suit be one for libel, or for any other legitimate cause-of-action, and simply is, to repeat it another way, this: "On motion to direct a verdict the court presumes to be true the evidence of the opposite party, who is entitled to the most favorable construction that it will properly bear and to the benefit of all reasonable inferences therefrom. * * * All contradictory or countervailing evidence is left out." See Coca-Cola Bottling Co. v. Burgess, Tex.Civ.App., 195 S.W.2d, at page 381.

■ Moreover, when the sued-upon articles are examined in the light of the pleadings and evidence so presented by the appellant, it seems equally clear that questions-of-fact over whether or not they had been libelous toward him did arise, since he was undisputedly shown to have been in charge as master of the SS Warren Delano —with all the privileges, immunities, and responsibilities duly thereunto appertaining— during the entire time dealt with in both publications—that is, his service began January 31, 1946, and continued until August 22, 1946, 2 weeks after the August 9th article was published.

■ In this connection, when all counter-showing from the appellee's side has been thrown out of the appellate-window, as the quoted-rule requires, and both such articles are read and considered together,

as our Courts have held they should be in comparable situations, it seems reasonably probable that the ordinary reader would regard them as reflecting not only upon Captain Evans' personal and official conduct, but as well upon his competence to continue holding the position as master of a ship in such circumstances. Vernon's 1948 Texas Civil St. Art. 5430; Guisti v. Galveston Tribune, 105 Tex. 497, 150 S.W. 874; Southern Publishing Company v. Foster, Tex.Com.App., 53 S.W.2d 1014; Moore v. Leverett, Tex.Com.App., 52 S.W. 2d 252, at page 255; McDavid v. Houston Chronicle Printing Co., Tex.Civ.App., 146 S.W. 252, at page 260; 27 Tex.Jur., p. 751, par. 84, foot-note 17, and cited cases; and Ferguson v. Houston Press Co., Tex.Civ. App., 1 S.W.2d 387.

■ If that be true, then a jury, by all the authorities, was entitled to pass upon the truth or falsity of all the suggestive recitations either of the articles contained.

There can be no doubt that the two articles were in pari materia and constituted continuous publications of the same thing— at least in part—because Mr. Pierce, who was shown to have written the second article on August 9th, admitted that: "It was based in part upon the previous story, and what I got at the hall that night."

■ Further discussion is deemed unnecessary, since the conclusions stated determine the merits of the appeal; the material evidence upon whether or not it was actionable libel is held to have at least been in dispute; therefore, the appellee's motion for judgment should not have been granted.

The court's action in granting it is accordingly reversed, and the cause remanded for another trial.

Reversed and remanded.

MONTEITH, C. J., dissenting.

### Exhibit "A"

Headline across two-thirds of front page of Houston Post on Thursday, August 8, 1946. Headline in 1 1/16 and 3/4 inch solid black letters.

Crewmen Will Protest
Violence on "Jinx Ship"

Subheading to article covering the entire right hand column of the front page of the Houston Post.

Vessel Blazes Trail of Ill Luck
Across Ocean and Back

### By Sam Weiner

"Terming the collision-scarred, ammunition-bearing S.S. Warren Delano a 'jinx ship,' crew members of the vessel declared themselves lucky to be alive Wednesday night.

"The crew members recounted a bizarre tale of ill-luck which has dogged the vessel's course across the Atlantic to Antwerp and back across the ocean and Gulf of Mexico to Houston.

"She's a jinx ship—she ought to go to the boneyard, declared Deck Engineer William L. Caples, of Philadelphia, Pa.

"Most recent of the incidents which sent chills down the spines of crew members was on July 2, when the ammunition-laden ship ran aground at Buoy No. 8 in the Houston ship channel.

"That incident brought a probe by the United States coast guard in Houston. The investigation was revealed Wednesday.

" 'Nothing but trouble has followed us wherever we've gone,' said Caples.
Crew Gets "Itch"

He said the ship had rammed some piers in Reading, Pa., a ship in Antwerp, and canal locks in Holland.

" 'All crew members and officers have contracted "scabies" (a contagious itch), some one ran around the deck with a hatchet trying to kill a crew member, and two other men ran around with .45 caliber automatic pistols,' Caples declared.

"The violence took place, he said in the channel after the grounding.

"One of the men carrying the guns shouted, 'They might as well die here as elsewhere,' the deck engineer said.

"Caples said he boarded the vessel at Philadelphia last April.

" 'We left for the Reading coal pier and rammed it, knocking down part of the pier,' he said.

"Repairs had to be made on the vessel's plates before it left for Antwerp.

"Rams Ship

" 'When the ship arrived in Antwerp, it rammed a ship at the coal pier there,' " he related.

"One night a crew member on watch found an explosive on the deck of the ship, he said. They called American M.P.'s aboard to remove the explosive.

"Then disease hit the ship, he said.

"A member with 'Scabies' was sent to the American field hospital in Antwerp, and a week later everyone in the hospital—including doctors and nurses—was infested by the disease, he said.

"A few days later M.P.'s and Belgian police came aboard and arrested one man on a morals charge, he said.

"Food Disappears

"The ship's stores also disappeared. Crew members believe some one came aboard and stole them, selling them at black market prices to Belgians, he said.

" 'When the ship reached the canal locks in Holland, it collided with the locks' cement pilings, caving in three plates,' Caples declared.

"The vessel docked in Galveston after the return trip to America, tied up for a few days and proceeded up the Ship Channel toward Houston.

" 'There was a terrific thunderstorm with torrential rains, lightning and winds on July 2,' Caples recounted. 'After weathering it for a while, we finally ran aground at the buoy.'

"Appendicitis Strikes

"A third assistant engineer was seized with a case of appendicitis while the vessel was aground.

"Another crew member needed treatment for a finger he had smashed in the Antwerp collision. It had become infected during the trip to Houston.

"Tugs, straining desperately, tried to free the vessel, but to no avail.

"Meanwhile, the coast guard sent out navigation warnings to ships at Galveston and Houston, advising them of the ground-ed 'hot ship' (a maritime term for ammunition-laden vessels).

" 'It was during the hazardous days when the vessel was aground that the alleged incident of violence took place,' Caples said.

Coast Guard Called

" 'After the man with the hatchet, and the men with the pistols had run around the deck several times, somebody called the coast guard at Galveston,' he said.

"The coast guard boarded the vessel, according to Caples, and investigated.

"He and other crew member will relate this story to Patrolman Dempsey Farmer, Houston N.M.U. agent, at Thursday night's meeting, he said.

"Patrolman Farmer said the ship is tied up at the San Jacinto ordnance docks, but he was prevented by army officials from visiting the ship.

"A United States public health official visited it, however, to investigate the disease reports and also reports of malnutritious food, he said.

"The Ss. Warren Delano is a Liberty vessel operated by the war shipping administration, Caples said."

Exhibit "B"

Headline of Article on the front page of The Houston Post, Friday, August 9, 1946, accompanied by a picture of the S/S Delano taken by a staff photographer while ship moored at the San Jacinto Ordnance depot. Size of picture, 3¾ by 5 inches.

Jinxed by a Woman
Crew of the Delano Also
Blames Skipper, Mate

"Nobody is quite certain how it happened, but a woman jinxed the Ss. Warren Delano.

"The Liberty ship, which once plied the ice-cold Murmansk route after being named for a cousin of the late President Roosevelt, is unloading ammunition at the San Jacinto ordnance depot.

"Crew members contend that, in some ways, the voyage from Antwerp to Houston in peace-time was chillier than some of the trips to the Russian port during the war.

"Complaint Filed

"As a result, the National Maritime union through its patrolman here has filed written complaint with the United States coast guard asking that the license of the skipper, Capt. Thomas Evans of Baltimore, be revoked. The union has asked, also, that Chief Mate Sylvester Betey of Columbus, Ohio, be set down.

"Announcement to this effect was made Thursday night by Patrolman Dempsey Farmer, the N.M.U. agent in Houston. (The patrolman in the union setup hears crew 'beffs' and takes them higher if he thinks the complaints are justified.)

" 'We filed this complaint two weeks ago, but we're getting the runaround,' Farmer said after a second session with crewmen. 'We [See Crew Blames, Page 8, Column 2 Crew Blames Skipper, Mate——— (Continued from Page 1.)] are going to press for immediate action.'

"The jinx and its validity depend somewhat on the crewman and whether he is in the 'Flying Dutchman' tradition or whether he takes the more modern view that one reason for going to sea is to earn a living.

"Hecto Believes in Jinx

"For instance, Ulla Hecto, a seaman whose partly bald head has weathered some salty blowings, believes the ship is jinxed.

" 'It musta been a woman. The ship is crazy,' he says.

"Backing him, among others, is H. E. Wilson, dispatcher at the N.M.U. Hiring hall at 1010 Congress.

" 'When a ship is jinxed, it's a woman,' he said firmly. 'Women should stay off ships that ain't co-ed (passenger) to begin with. A woman has been on the Delano.'

"Deck Engineer William L. Caples of Philadelphia, Pa., disagreed with a violent slash of a tattooed arm. The tattoo was a sea-going fish of some sort with an anchor over it. It was done in tropical colors—*read* and green.

" 'Hell, I don't believe in that stuff,' Caples said. 'You take a ship loaded with moitahs, with grenade, with bags of powder (The bags of powder are the worst, Brother, they make you worry.) And you

bang the ship into the docks at Antwerp on May 28.'

"Down in the Mud

" 'And then you manage to get across the Atlantic with 8500 tons of explosive and you set the ship down in the mud in the Ship Channal on July 2.

" 'Brother, that's the management. That ain't the jinx.'

"Crew members, none of whom are first trippers, Caples says, report the ship was banged into coal piers at Reading, Pa., at the start of the voyage to Antwerp.

"Scabies, appendicitis, and a food shortage plagued the crew, Caples told Patrolman Farmer.

" 'We were stored (provisioned) for six weeks, the voyage took nine,' he said in the 'beef' session Thursday night. 'We ran short of everything—coffee, tea, meat.' Grounded 14 Days

"The ship was grounded at Buoy 8 in the Channel for 14 days. Ten tugs used by the army couldn't get her off, and the navy moved in and pulled her out of the mud with one seagoing tug.

"Crewmen said they expected unloading at the depot to take two more weeks.

"Patrolman Farmer says the crew has two routes to get action on its complaints and that the N.M.U. will pursue both of them.

'We have a complaint before the coast guard. We will also file one with the Marine Transport Management,' he said.

"Marine Transport is operating the ship for the war shipping administration."

MONTEITH, Chief Justice (dissenting).

I am unable to agree with the views of the majority of the Court that the pleadings of appellant and the evidence adduced on the trial of the case raised a material issue of fact for the determination of the jury.

Appellant in filing this action sought recovery of damages claimed by him to have resulted from the publication of false and malicious statements concerning himself and the ship he commanded in articles published and circulated by the Houston Post on August 8th and 9th, 1946.

On the trial, after the submission of the case, the jury reported that it was unable to answer the issues submitted. Thereupon the trial court discharged the jury and rendered judgment in favor of appellee, based on his conclusions that appellee was entitled to judgment under the undisputed evidence as a matter of law. The court held in the judgment rendered that the articles on which the action was based had not been published with malice; that they contained no reference to appellant; and that under the pleadings and evidence in the case the truth or the substantial truth of all statements in the articles alleged to be libelous was established. The court held that the statement in the article published on August 8, 1946, did not constitute a libel of appellant and that the statements in each of the articles in question were privileged communications under Article 5432, Revised Civil Statutes.

At appellant's request the trial court prepared and caused to be filed his findings of fact and conclusions of law in which he found as facts that under the undisputed evidence the articles in question which had been printed, published and circulated by appellee were not published with malice, and that they contained no reference to appellant; that the articles in question did not tend to injure appellant's reputation in the mind of the ordinary reader, and that he had not been discharged as the master of the S.S. Warren Delano by reason of the publication of said articles, but that he had voluntarily left his said employment at his own request. The court further found that the articles in question were concerned with incidents of navigation and that their contents were the subjects of public interest and concern upon which the public was entitled to be informed, and that insofar as they made reference to appellant, they were a reasonable and fair comment or criticism of him with respect to matters of public concern, and were published for general information.

It is well established in this State that where a jury has failed to agree upon a verdict and has been discharged, a trial court has the authority to discharge the jury and to render judgment for defendant if he could have properly directed a verdict in defendant's favor. Hutchison v. East Texas Oil Company, Tex.Civ.App., 167 S.W.2d 205; Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377; Cline v. Insurance Exchange of Houston, 140 Tex. 175, 166 S.W.2d 677, Id., Tex.Civ.App., 154 S.W.2d 491.

Appellant contends that each of the articles in question are libelous and that they must be read and considered together as a single article to determine whether they are, as a matter of law, libelous. This contention cannot, I think, be sustained.

In the case of Houston Press Co. v. Smith, Tex.Civ.App., 3 S.W.2d 900, 909, this Court, in holding that it was error to combine several articles published on different dates as constituting one cause of action, said: "Each of the alleged articles must stand alone, and, if libelous under the law, it constitutes a separate and distinct cause of action, and in such case the defendant has the right to demand separate findings on each article."

The first article complained of is, I think, unambiguous and devoid of any defamatory meaning. It appears to be an article concerning the happenings on board the ship, and no one was held either directly or indirectly responsible for them. No reference to a criticism of appellant was made in the article.

The second article is, in substance, a report on a meeting of the members of the crew called by members of the crew for the purpose of discussing with their union representatives the grounds for charges to be urged against appellant and the Chief Mate. This article refers briefly to the incidents on which the complaints had been based. The complaints which grew out of this meeting were later filed with the Coast Guard.

The truth of the material statements in both articles was, I think, as found by the trial court, established by substantial evidence. The statements were also, I think, privileged communications.

It is well established in this State that the truth of a defamatory statement or of a published fact is a complete defense to an

action for defamation. Restatement of the Law of Torts, Sec. 532. It has been uniformly held that it is not necessary to prove the literal truth of the precise statement made. 27 Tex.Jur., 637; Express Publishing Company v. Keeran, Tex.Com.App., 284 S.W. 913; Houston Press Co. v. Smith, Tex.Civ.App., 3 S.W.2d 900.

It follows, I think, that no error was committed by the trial court in rendering judgment for appellee.

For the above reasons the judgment of the trial court should, in my opinion, be in all things affirmed.