**Robert CASEY et ux., Appellants,**

v.

**SANBORN'S INC. OF TEXAS et al., Appellees.**

**No. 15796.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

March 9, 1972.

Rehearing Denied April 6, 1972.

Brown, Kronzer, Abraham, Watkins & Steely, Dale Friend, Houston, for appellants.

Wilson & Guest, William M. Coats, Houston, for appellees.

PEDEN, Justice.

Plaintiffs sued travel agents for damages for personal injuries received on a trip in Mexico. Plaintiffs appeal from the granting of a motion for judgment

entered at close of their case in chief in a non-jury trial.

The points of error filed by appellants, Mr. and Mrs. Casey, are that the trial court erred in granting judgment for the defendants because there was evidence of probative value raising issues of fact for determination by the court of 1) a breach of contract, 2) a breach of an implied contractual duty to furnish safe passage, 3) liability of Sanborn's as agent for an undisclosed principal, 4) negligence by an employee of Sanborn's, the agent for an undisclosed principal, and 5) negligence as to Sanborn's, principal for its agents in Mexico.

■ Neither findings of fact nor conclusions of law are found in the record, and it does not appear that they were requested. We do not agree with the appellees' contention that in the absence of such request a presumption arises that all issuable facts were found in support of the judgment.

■ In a non-jury trial, when the plaintiff rests the defendant may move for judgment, and the court applies to such motion the same rules which would determine the propriety of instructing a jury to return a verdict. 4 McDonald, Texas Civil Practice 5, § 16.04 (rev. ed. 1971); Lorino v. Crawford Packing Co., 169 S.W.2d 235 (Tex.Civ.App.1943, aff. 142 Tex. 51, 175 S.W.2d 410). Under such test the course must presume to be true the evidence of the plaintiff, who is entitled to the most favorable construction that such evidence will properly bear and to the benefit of all reasonable inferences arising therefrom. Rhinetubes v. Lloyd, 335 S.W.2d 269 (Tex.Civ.App.1960, writ ref. n. r. e.); Evans v. Houston Printing Corp., 217 S.W.2d 85 (Tex.Civ.App. 1948, writ ref. n. r. e.); Coca Cola Bottling Co. of Ft. Worth v. Burgess, 195 S.W.2d 379 (Tex.Civ.App.1946, writ ref. n. r. e.); Burkhardt v. Harris, 200 S.W. 2d 445 (Tex.Civ.App.1947, no writ).

The petition on which the Caseys went to trial alleged that they sustained injuries while taking a tour in Mexico arranged for them by Sanborn's, Inc. of Texas and Mr. Dan Sanborn, d. b. a. Sanborn's International Travel Service. That defendants, acting through their agents and employees, contracted with the plaintiffs to furnish them competent guides and drivers to steer them in Mexico; that plaintiffs paid their money to defendants and took the trip to Mexico, where the guide furnished to take them from Mexico City to Acapulco engaged in very hazardous driving; his negligent driving proximately caused a wreck, injuring both plaintiffs. He was caused to be selected and hired by the defendants, and the circumstances are such that they are responsible for his negligence. Further, that defendants breached their contract with the plaintiffs, causing plaintiffs' injuries and damages.

The defendants answered by general denial. The record does not show that exceptions were levelled to the plaintiffs' petition.

Mr. Casey testified that he went to Sanborn's office in Houston and contracted with them to provide a tour to Mexico for his wife and himself. He paid Sanborn's for the pre-arranged tour, and he and his wife left Houston on December 7. The itinerary introduced in evidence as Plaintiffs' Exhibit No. 1 was furnished by Sanborn's. On the cover there is stated in large letters: "SANBORN'S MEXICO TRAVEL SERVICE—OFFICES. ITINERARY SPECIALLY PREPARED FOR M/M R. CASEY" It contains six printed pages with spaces for dates, names of airlines and hotels, etc. to be typed in. The first interior page shows that the Caseys were to arrive in Mexico City on December 7, 1968 by Braniff Flight Number 51, then states: "Welcome to Mexico City—

"Upon your arrival to the airport of Mexico City, you will immediately go

through immigration and customs employees of the Airline Company will indicate the way to pass through customs, and will give you all the help you may need. Immediately after, our transfer-man will be waiting for you at the door, calling your names, and will give you all the necessary help with your baggage. He will transport you by car to the Hotel . . . CRISTOBAL COLON . . . where we have confirmed your reservations, and will give you all the information you may request, delivering your hotel coupons,

IMPORTANT: Up to date it has never happened, but if for any reason our transfer-man is not waiting for you at the place of arrival, please address yourselves to the Airline Company and ask them to locate by microphone the representative of ROMFEL TRAVEL SERVICE, or immediately phone our general offices."

Page 6 of the itinerary provides:

"DATE DECEMBER 11, 1968 CUERNAVACA, TAXCO AND ACAPULCO. Our representative will call for you at your hotel at 10:00 A.M. to drive you from Mexico City's high plateau to the sub-tropical and peaceful city of Cuernavaca . . ."

It provided that after the Caseys visited that city they were to be taken to Taxco. ". . . On the second day, after breakfast, with our guide you will continue the trip by road . . ."

The only mention of Romfel Travel Service is the reference we have noticed on the first interior page of the itinerary. On the back of the outer cover of the itinerary is stated: "Sanborn's Travel Service Offices Mexican Wholesale Tour Operators." The office addresses and telephone numbers of their executive and branch offices in Mexico City are also listed.

Mr. Casey further testified that they were met at the airport in Mexico City by a man who introduced himself as a representative of Sanborn's, who took them to the hotel in his car. Another Sanborn's representative took them to the bullfights the next day, and a third one took them on a tour to the pyramids the next day. The next day, a Wednesday, they were met in the lobby by a man who said he was from Sanborn's. He drove his car. The portion dated December 11, 1968, as shown on page 6 of the itinerary in evidence, was the part they were on when the accident occurred. This driver was impolite in that he wouldn't answer questions. He spoke English and Mrs. Casey speaks Spanish, so it wasn't a language problem. Casey has driven for 14 years. The driver drove too fast. The car looked like a 1964 Chevrolet. When they left Taxco to go to Acapulco, they asked him to slow down, but he didn't. The road was in the mountains and had many curves. Casey was drowsy, but knew the car was going close to 65 or 70 miles per hour. The driver lost control and hit the side of the mountain. Mr. Casey was knocked unconscious. He described his injuries and those of his wife. They were taken to a nearby hospital by some other travelers. They called Sanborn's and were told to take a taxi to Acapulco, fifty miles away, and that Sanborn's would pay for the taxi.

On cross-examination Mr. Casey testified that when he bought the tour from Sanborn's he left all the arrangements to them; he didn't think they were going to hire someone off the street with a car, which is about what they did. He had understood that all the drivers were supposed to be employed by Sanborn's, but he found that apparently they were hired on the spot by Sanborn's as needed. None of the cars had a Sanborn's sign on it. The itinerary in evidence was given to him here in Houston when he paid Sanborn's.

When the accident happened, it had not rained. The road was fairly straight, and they were approaching a curve when the car went out of control.

Mrs. Casey's testimony added that when the accident happened she and her husband were on the back seat of the car; he was seated behind the driver and she was on the other side of the seat. She had remarked that the driver was driving fast. She noticed that the speedometer said 90 miles an hour, but it could have been 80, because she was looking at it from an angle. Suddenly the car went out of control and crashed into the mountain.

On cross-examination she testified that she saw no speed limit signs. She agreed that she could be making the mistake that the speedometer was showing 90 kilometers an hour, but that it looked like a regular speedometer. They called Sanborn's in Mexico City about getting a taxi to take them on to Acapulco. They found the telephone number on the back of the itinerary.

On re-direct examination Mrs. Casey testified that there was nothing about the condition of the roadway or about anything in the road that caused the automobile to go out of control.

Mr. Stewart Purdy testified that he is now and was in December of 1968 the manager of Sanborn's travel offices in Houston. He did not indicate any direct participation in Sanborn's dealings with the Caseys. Sanborn's was then and is now in the business of selling tours through Mexico. Sanborn's sold pre-arranged tours which included all travel, hotels, meals and sight-seeing. The purchaser wouldn't know the prices of the parts of the tour.

Dan Sanborn does business as International Travel Service. Purdy said that Plaintiffs' Exhibit No. 1, the Caseys' itinerary, was prepared by Romfel Travel Service in Mexico City. Sanborn's, in Houston, customarily issues to the customer a brochure showing what will be included in the tour, but doesn't name which Mexican company is being used. The brochure says, though, that it is Sanborn's

International Tour Service. Part of the package is that the tourists can rely on Sanborn's to get the job done and they look to Sanborn's. He related that they do tell the travelers that an agent of the service will meet them and they explain that it is the Romfel Travel Service. Sanborn's investigates the operators it uses in Mexico. He knows Mr. Sacal. "Mr. Sacal is the owner of Sanborn's . . . not Sanborn's, but Romfel Travel Service in Mexico City." Under Mexican law, Sanborn's can't do business in Mexico, but Romfel has an arrangement to use Sanborn's name in Mexico, and on that basis Romfel and Sanborn's are one and the same in Mexico.

Sanborn's sells the packaged tour that Romfel has planned and set up. Sanborn's notifies Romfel when the tourists will arrive and which packaged tour has been sold to them.

As travel agents, it is Sanborn's job to pick the tour cars and drivers; the tour customers are not told they will have any choice.

Admissions of the defendants were introduced in evidence. They include admissions that the correct name of the defendant company is Sanborn's, Inc. of Texas, and it is a Texas corporation doing business in Texas. It owns and operates Sanborn's Travel Service office in the Esperson Building, Houston.

Two exhibits also admitted in evidence were stipulated by the defendants to be original receipts issued by Sanborn's International Travel Service of Houston to Robert Casey. They show that on 11–20–68 he paid $224. for two air tickets "Hou—Mex—Aca—Hou," and $221. for two tours "IT—SANMX—87." A second receipt shows that on 11–22–68, Mr. Casey paid an additional $8. for two "Bullfight tours additional to IT—SANMX—87."

As we have noticed, the plaintiffs' evidence must be presumed to be true; it must also be given the most favorable construction it will properly bear and the ben-

efit of all reasonable inferences arising from it.

■ Applying this test, we hold that there was sufficient evidence from which it could be reasonably inferred that the driver of the automobile was selected by Romfel, that Sanborn's did not disclose to the Caseys that Romfel (or anyone else) was Sanborn's principal, that on December 12, 1968 such driver operated his car at a negligent rate of speed under the circumstances, proximately causing painful physical injuries to both plaintiffs and that the driver's negligence amounted to a breach of Sanborn's implied agreement to furnish safe, or non-negligent, passage.

It is clear that the parties contracted for a packaged tour, the money was paid and the trip taken.

■ "It is the duty of the agent, if he would avoid personal liability on a contract entered into by him on behalf of the principal, to disclose not only the fact that he is acting in a representative capacity but also the identity of his principal, as the person dealt with is not bound to inquire whether or not the agent is acting as such for another."

Murphy Chevrolet v. Auto Auction, 413 S.W.2d 474 (Tex.Civ.App.1967, writ ref., n. r. e.); Mahoney v. Pitman, 43 S.W.2d 143 (Tex.Civ.App.1931, writ ref.); 2 Tex. Jur.2d 662, Agency § 210.

■ In the absence of pleading and proof, the law of another country is presumed to be the same as that of Texas. Tortuguero Logging Operation, Ltd. v. Houston, 349 S.W.2d 315 (Tex.Civ.App. 1961, writ ref. n. r. e.); Pauska v. Daus, 31 Tex. 67 (1868); 1 McCormick & Ray, Texas Law of Evidence 132, § 99 (2nd ed. 1956).

■ We also sustain the appellants' negligence theory. The relationship between the driver of the car and Romfel is subject to application of the rule stated in Newspapers, Inc. v. Love, 380 S.W.2d 582, 591 (Tex.1964):

"In the absence of evidence showing a different relationship between the parties, the fact that the alleged servant was performing services peculiar to the principal's business or affairs establishes prima facie that the relationship of master and servant exists between them." Citing McAfee v. Travis Gas Corp., 137 Tex. 314, 153 S.W.2d 442 (Tex.1941).

■ Sanborn's held out Romfel's employees as "our men in Mexico," and the driver represented that he was "from Sanborn's." Both were performing services peculiar to Sanborn's business. We conclude that the evidence made a prima facie case of respondeat superior.

The judgment of the trial court is reversed and this cause is remanded.