**W.P. GOTCHER, Appellant,**

v.

**LAMAR STATE BANK, et al.,
Appellees.**

**No. 09–85–248 CV.**

Court of Appeals of Texas,
Beaumont.

June 19, 1986.

Appellant's Rehearing Denied
July 7, 1986.

Appellee's Rehearing Denied
Aug. 20, 1986.

Kerwin B. Stone, Moore, Landry, Garth & Jones, Beaumont, for appellant.

Steven D. Strickland, Orgain, Bell & Tucker, Beaumont, Millard A. Johnson, Houston, for appellees.

OPINION

BROOKSHIRE, Justice.

Suit on promissory notes, guaranty agreements and articles of limited partnership. Lamar State Bank [sometimes re-

ferred to as "Lamar Bank"] recovered a judgment against Billy J. Holman, Sr. and W.P. Gotcher and United Leasing Company, Ltd., a limited partnership in a joint and several manner, in the sum of $119,315.36, with court costs. Attorneys' fees and expenses were recovered by the bank. The trial court denied Gotcher's third party claim against Walter A. Riddle, Thomas B. Transou and one other alleged limited partner. The trial court denied Gotcher's counterclaim against the bank wherein Gotcher sought relief under the Texas Deceptive Trade Practices Act. The trial was before the court.

Findings of fact and separate conclusions of law were filed. The trial was memorialized in a complete statement of facts as well as a transcript. Significant documentary exhibits were included in the record.

### THE LIMITED PARTNERSHIP

Gotcher and Holman contended that a limited partnership was created in February of 1979. The partnership was named "United Leasing Company, Ltd." Billy J. Holman, Sr., was the general partner. W.P. Gotcher, Thomas B. Transou, Walter A. Riddle and Don Wilson were limited partners. United Leasing was originally formed to handle the leasing or purchasing of heavy equipment. The original business activities of United Leasing stressed the purchasing of heavy construction equipment for leasing and for repurchasing by other companies. Later, the partnership opened a pizza restaurant in Clear Lake City in 1980. Diversification of the partnership's business was the aim of this pizza parlor. The original pizza parlor experienced financial difficulties. It was relocated in Houston near the University of Houston.

During this early period of approximately 1979 and 1980, the limited partnership was financed by the proceeds of certain loans made by Allied Bank of Deer Park, First State Bank of Bellaire and the First City Bank of Inwood Forest. To obtain these loans, it was necessary for Billy J. Holman, Sr., as the general partner, and each of the limited partners; namely, Gotcher, Transou and Riddle, to execute personal guaranties as security for repayment of the promissory notes to finance United Leasing Company, Ltd. Wilson had left the State before these loans.

### THE BEAUMONT PIZZA PARLOR

Billy J. Holman, Sr., testified it was decided to open a second pizza parlor in Beaumont, in March, 1981, near the Lamar University campus. Lamar State Bank initially advanced $15,000.00 to construct a "build-out" in or on the lease space and to purchase certain necessary equipment. About 2 or 3 months later, just before the opening of the Beaumont pizza parlor, it was determined that considerable additional working capital was required. Holman contacted, and had conversations with, Mr. Lonnie Weir, President of Lamar State Bank. They discussed a renewal and consolidation of certain existing indebtednesses as well as new loans for working capital to be in the total sum of $60,000.00.

In about mid-May of 1981, there was a meeting between Weir, Holman and Gotcher at Lamar State Bank. This was a crucial meeting. During the meeting, a promissory note was executed by Holman, as general partner, on behalf of United Leasing Company, Ltd., in the principal amount of $60,000.00. At the same time, Gotcher executed a continuing personal guaranty for the $60,000.00.

The trial judge found the other limited partners were not aware of the original $15,000.00 bank loan, nor were they aware or apprised of the second loan totalling $60,000.00; nor were they aware of a third loan in the amount of $8,000.00. Riddle said he was not aware of the existence of a Beaumont pizza parlor until after it was closed and its creditors were demanding payment of debts. He stated that the Beaumont restaurant was an entirely separate venture of Holman and Gotcher.

### WEIR'S TESTIMONY

Weir's testimony was that the $60,000.00 loan was actually funded and deposited into

the account of United Leasing Company, Ltd., while both Holman and Gotcher waited in his office, being in the Lamar State Bank, on May 14, 1981. Weir swore that the loan was made solely on the basis of the personal guaranty delivered by W.P. "Pete" Gotcher. Gotcher's financial strength was the only reason the bank agreed to the $60,000.00, Weir verified.

Later, in the latter part of June, 1981, a third, or additional, loan of $8,000.00 was made to United Leasing Company, Ltd. The $8,000.00 was funded into its account. Again, the loan was guaranteed by the personal guaranty of Gotcher.

In the latter part of 1981, the Beaumont pizza restaurant failed and was closed. The Lamar State Bank was required to attempt to recover the loans. It exercised forbearance at the request of Holman and Gotcher, who were seeking an additional refinancing loan from the Small Business Administration. The Small Business Administration loan application failed. The bank proceeded to foreclose on the collateral and file suit to recover monies due on the several consolidated promissory notes. The suit was also based on the several continuing guaranties given to the bank, on an individual personal basis, by both Holman and Gotcher. Holman had signed the notes as a general partner.

## WERE THE PERSONAL GUARANTIES OF GOTCHER AND HOLMAN CONDITIONALLY DELIVERED TO THE BANK ON THE EXPRESS STIPULATION THAT THEY WOULD NOT BECOME EFFECTIVE UNTIL SIMILAR PERSONAL GUARANTIES WERE OBTAINED FROM THE REMAINING LIMITED PARTNERS?

Appellant vehemently argues, in his first point of error, that the guaranties sued upon were conditionally delivered to the bank. The alleged condition was a verbal understanding that the 2 personal guaranties were not to become effective or operative until the bank obtained the personal guaranties of the remaining limited partners of United Leasing Company, Ltd. Appellant argues that, in direct violation of this strict condition precedent, the bank failed to procure the other required personal guaranties.

We stress, this was a Bench trial. The Bench had all the rights, powers, duties and prerogatives of a trier of fact.

Our only Appellant, Gotcher, had, at a prior time, executed a personal guaranty agreement at a bank located at Inwood Forest. Gotcher had also executed a personal guaranty for promissory notes at the Allied Bank and at another bank in the Seabrook area. These personal guaranties were protecting notes made by United Leasing Co., Ltd. He had also executed personal guaranties for debts of companies other than United Leasing Co., Ltd.

Gotcher had been sued once before the case subjudice on a personal guaranty. Apparently, he owned a company called Tri-City Trucking Company. He understood the substance of these personal guaranties, realizing he could be sued on the same, thereby potentially becoming liable, jointly and severally, with the note maker. He was familiar with joint and several liability. He acknowledged that he had personally visited the bank and signed the guaranty. He thought that a portion, perhaps about half, of the proceeds of the $60,000.00 note of May 14, 1981, were used to pay off a debt of the limited partnership at the Inwood Forest Bank.

On several occasions, he was contacted or called by Mr. Weir to advise him (Gotcher) that the notes were delinquent. These calls were probably communicated to Gotcher in late 1981. He did not, at that time, tell Weir that he (Gotcher) had no liability under the guaranties. In the fall of 1981, Gotcher served as a director of the Allied Merchants Bank in Port Arthur. It is fair to state that Gotcher had in-depth business experience as well as actual banking experience.

## THE INWOOD FOREST LOAN

By the middle of May, 1981, United Leasing Company, Ltd.'s indebtedness to the

First City Bank of Inwood Forest was due. Demand had been made for the remaining balance of approximately $27,000.00. When the $60,000.00 was obtained from the Lamar State Bank, approximately $27,000.00 was paid to the Inwood Forest Bank. Appellant had personally guaranteed the note at the Inwood Forest Bank. We find in the record (from Gotcher):

"Q But you do not dispute that you were personally liable on the debt to the Inwood Forest bank?

"A No, sir.

"Q You were liable on it?

"A Yes, sir.

"Q Do you recall what the use of the proceeds of the $60,000.00 note, which is exhibit P–1, was to be?

"A To pay off the Inwood bank and to purchase additional equipment.

"Q Do you recall approximately how much was owed to the Inwood Forest bank?

"A No. Maybe half.

. . . .

"Q Okay. Now you had executed at least one personal guaranty prior to executing that guaranty which is exhibit P–2, and that is the one to the bank at Inwood Forest, correct?

"A Yes.

"Q Do you recall whether or not you ever executed any other personal guaranty?

"A I executed a personal guaranty at Allied Bank; Clear Lake Allied, somewhere over in that area; Seabrook maybe.

"Q For United Leasing Company, Ltd.?

"Yes."

### THE $60,000.00 NOTE

Basically, the $60,000.00 note was to pay off the Inwood Forest indebtedness and to obtain additional funds as either working capital or to obtain some additional funds as either working capital or to obtain some additional equipment for the Beaumont pizza parlor. During the actual meeting of Holman, Gotcher and Weir, in Weir's banking office, Holman, as general partner, executed and delivered the said $60,000.00 promissory note, as well as a security agreement on United Leasing Company, Ltd., restaurant equipment. At the meeting, Appellant signed and delivered his personal guaranty for the said $60,000.00.

There is substantial and sufficient evidence of strong probative force that neither Holman nor United Leasing Company, Ltd., had sufficient credit or assets to justify a loan of this magnitude. Banker Weir required the Appellant to sign a continuing guaranty for the full amount of the loan. Gotcher admitted that, after knowledge that $60,000.00 had been funded to United Leasing Company, Ltd., an additional $8,000.00 note had been advanced to United Leasing Company, Ltd. When he executed the last $65,000.00 personal guaranty, Gotcher was fully aware that the other limited partners had not executed any guaranties whatsoever. He further acknowledged that, at the time of the signing of his second personal guaranty, he had discovered that the other limited partners, Riddle and Transou, had not executed any personal guaranties.

At least, there is some evidence that, when the first demand was made on Gotcher, in the fall of 1981, Gotcher called Holman and asked something to the effect: "Where are these other people's guaranties?" They were not available and Holman was requested by Gotcher to get the guaranties. This took place before Gotcher executed the second guaranty for $65,000.00, which is dated January 26, 1982.

By October, 1981, Lamar Bank had notified Gotcher to make payment on the notes. From Gotcher's deposition, that was read into evidence, we find:

" . . . 'A. Also at that same time I discovered that these other guarantors were never secured.' 'Q. You had discovered that in the fall of 1981?' 'A. Yes, sir, once they became delinquent, that's when I discovered these guaranties.'"

Gotcher admitted that, prior to his execution of the last guaranty, he had never advised the bank that he took the position

that he was not liable on the earlier guaranty.

When Weir was asked to describe the circumstances surrounding the execution and delivery of the $60,000.00 note, dated May 14, 1981, and the continuing guaranty on the said $60,000.00 note, Weir, in substance, testified that Billy J. Holman, Sr., and Pete Gotcher came to his office; that Pete Gotcher had his financial statement and verified his own financial statement. Gotcher said he wanted to guarantee this obligation. Weir said United Leasing had no financial basis to make this loan on. Gotcher was willing to guarantee it (the $60,000.00 loan). Weir unequivocally swore that he would not have made the $60,000.00 loan without the personal guarantee of W.P. "Pete" Gotcher, the Appellant. And, further, that when the Appellant executed the Continuing Guaranty Agreement, he did not express to Weir any conditions or limitations on his liability thereunder. When Weir was asked about any conditions and contingencies on Gotcher's continuing guaranty liability, the banker answered:

"A   Absolutely not.  In fact, to the contrary.  He was very boastful that he could get $55,000.00 or $75,000.00 at any bank with his financial statement reputation.  My verification with Allied Bank and Bruce Whitehead for Allied Bank and the Pleasure Island Commissioner, whose brother was his former partner, vertified that his boasting was correct.
"Q   His [Gotcher's] credit certainly justified a $60,000.00 advance?
"A   By and far, yes."

Further, Weir unequivocally swore that his bank immediately dispursed the $60,000.00 in funds on the same date, being May 14, 1981.  Weir swore:

"At that same sitting he [Gotcher] got a duplicate deposit slip which he handed to Billie Holman and it was disbursed right there."

THE $8,000.00 NOTE OF JUNE 26, 1981

Weir testified that, concerning the $8,000.00 note, the pizza parlor operation had been running and the equipment was in place.  Business was in progress.  But business was slow and fresh working capital was needed.  The Lamar students were out of school at the time.  After the last loan, being the $8,000.00 loan, became due, the bank made demand on Gotcher that these notes be paid.  Weir said that, about that time or a little later, he was told by Gotcher to "hold off there if you can" because: "I'm getting a SBA loan through Allied in Port Arthur".  Weir said that he was advised about the SBA loan by both Pete Gotcher and Billy J. Holman, Sr.  As a result, the Lamar Bank did forbear.

Weir identified Plaintiff's Exhibit P–4 as being a Continuing Guaranty agreement, signed by Pete Gotcher, in the amount of $65,000.00, dated January 26, 1982.  This $65,000.00 continuing guaranty, made by Gotcher, was signed and delivered under the following circumstances.

The SBA loan was not going to be forthcoming.  The $8,000.00 note was substantially delinquent, being more than 90 days late.  Gotcher and Holman asked that formal demand not be made on them.  They asked that the obligations and debts be consolidated and they would then proceed to pay off the consolidated indebtedness within a reasonable period of time.  Weir then agreed to the forbearance and the consolidation.  Hence, an appropriate note and a $65,000.00 continuing guaranty were made and delivered, which was a consolidation, renewal and extension of the debts.  Weir swore that Gotcher, in the execution of the second continuing guaranty, did not indicate, in any way, that his guaranty or any obligation thereunder was conditional in any respect.  Further, Weir testified that he renewed and extended, and agreed to renew and extend, the obligations relying solely on Gotcher's guaranty, Gotcher's financial statement, and on his reputation.  The trial court obviously believed this evidence.  Weir did not look to Holman, in reality, because:

"A ... Mr. Holman didn't have anything.  I've known him for a number of years.  The pizza place was out of business at

that point. *Mr. Gotcher was my sole reason for making the loan and the sole support for the loan.*" (Emphasis added)

■ Weir unequivocally testified that *he* never intended to get any continuing guaranties from the other limited partners. Weir said that he advised both Gotcher and Holman of this intention. Initially, Weir said, he had no intention to make the loan because of the fact that the persons involved were mainly Houston residents and that the Beaumont Pizza Parlor was an unopened business. Weir's willingness to make the loan was:

"A ... Pete Gotcher *because of his reputation and his finances here locally.* When he came to the office this was the proposition that he laid in here between he [sic] and I [sic]. *I had no interest any further than that.*" (Emphasis added)

We concede that there was conflicting evidence on the issue of Gotcher's personal guaranties being strictly conditioned; but the fact finder decided against Gotcher and for the bank on this point. Obviously, the trial judge accepted the testimony of Weir. He did not find that the testimony of Gotcher and Holman constituted the preponderance of the evidence on this issue. A fact finder can believe all of one witness' testimony or none. The trier of facts can also believe part of a witness' testimony and disbelieve other parts. We find in the record:

"Q Well, Mr. Gotcher, you are a director of a bank and you understanding banking and how it works and you heard the testimony today as to the credit standing of United Leasing Company and Mr. Holman and you know that when you left Mr. Weir's office on May 14, 1981, that the only people on that obligation was United Leasing Company by Mr. Holman and Mr. Holman's personal guaranty and you. *Now do you believe, as a prudent banker, that Mr. Weir would have funded that note if he had felt that you were not liable on it?*

"A *No, he wouldn't have funded it if he didn't think I was liable on it; that's true.*" (Emphasis added)

The trial judge had the opportunity to view the demeanor, the actions, the facial expressions, the tenor, the quality of voice and the whole conduct of the various witnesses in this case. He was thus in a much superior position to ascertain the truth. We are not. Under accepted and standard rules of appellate review, we cannot sustain Point of Error No. 1. We overrule it. We must repeat that there is much other evidence that sustains the trial court's ruling. On this point, there is ample, additional evidence of compelling probative value that, at the time Gotcher executed the guaranty, which is in evidence as Plaintiff's Exhibit No. P–4, for $65,000.00, benefiting United Leasing Company, Ltd., he knew the proceeds had been advanced to United Leasing and he was aware that the other limited partners of United Leasing had not executed any of their personal individual guaranties.

## WAS THE LAMAR BANK THE OWNER AND HOLDER OF THE NOTES AT THE TIME OF TRIAL?

■ The entire record in this case glaringly demonstrates that all the parties not only assumed the position, but actually took the position, in trial, that the Lamar State Bank was the owner and holder of the notes and the guaranties at the time of trial. Indeed, the bank proved up the signatures and execution and delivery of the notes and the guaranties from the Appellant, himself. The bank was in possession of the notes and guaranties. The bank produced these instruments in court. The bank was named in the notes as the payee.

*TEX.BUS. & COM. CODE ANN. sec. 3.307(b)* (Vernon 1968) provides:

"When signatures are admitted or established, production of the instrument entitles a holder to recover on it unless the defendant establishes a defense."

The entire record, both as to the direct evidence and the circumstantial evidence, proves that the bank was the "holder" in

the sense that it had possession of the written instruments and produced them in court and proffered them into evidence. Pursuant to *section 3.307(b)*, we hold that the bank, as a holder, is entitled to recover on the notes and the guaranties, under this record. Furthermore, *section 3.307(a)* specifically provides that unless, in the pleadings, the signatures are specifically denied as to each instrument, then the signatures are admitted.

The trial judge found that the Lamar Bank made the demands on Gotcher and Holman to pay these notes. The trial court concluded that W.P. "Pete" Gotcher was liable to Lamar Bank for the payment of the said indebtednesses of United Leasing Company, Ltd., in the amount of $106,-265.13, including principal and interest to August 22, 1985, and, in addition, is liable to the said bank for reasonable attorneys' fees incurred in the collection of this debt, totalling $13,050.23, for a grand total of $119,315.36. The trial judge additionally found that Gotcher's liability was also based on the terms of the guaranties.

In various detailed findings of fact, the trial judge found that Lamar Bank advanced the proceeds of the May 14, 1981, $60,000.00 note and that the consideration for W.P. "Pete" Gotcher's guaranty was the advancement of these funds by the Lamar Bank on May 14, 1981, and that Lamar Bank made the $60,000.00 loan on the credit and financial standing of W.P. Gotcher.

The trial court further found that in late December, 1981, or January, 1982, Billy J. Holman, Sr., and W.P. Gotcher negotiated with Lamar Bank to renew and extend the notes, which were then in the principal sum of $65,000.00; that for such renewal, extension and consolidation and the further consideration of the bank's forbearance, Gotcher signed and delivered the $65,-000.00 guaranty dated January 26, 1982.

In his separately filed Conclusions of Law, the trial court found that United Leasing Company, Ltd., is liable to Lamar Bank on the indebtedness evidenced by the notes and that Pete Gotcher was liable to

Lamar Bank in the then total sum of $119,-315.36, based on the terms of the two continuing guaranties.

We sanguinely hold that, by necessary inference from the findings of fact and conclusions of law, Lamar Bank was the holder, owner and possessor of the notes and guaranties in question.

## DID LAMAR BANK VIOLATE THE TEXAS DECEPTIVE TRADE PRACTICES—CONSUMER PROTECTION ACT?

■ Gotcher argues that the trial judge fell into error in failing to award judgment to him, as against Lamar Bank, on his own counterclaims under the provisions of the Texas Deceptive Trade Practices—Consumer Protection Act. The evidence on this point is in stark conflict. It would unduly lengthen this opinion to recite the conflicting testimony.

The trial court, in a separate finding of fact, held:

"36. The defendant, W.P. "Pete" Gotcher failed to prove that his liability on either of the above described guaranties was in any way conditioned upon the debts of United Leasing Company, Ltd. to Lamar Bank being guaranteed by anyone other than himself and failed to allege or prove any other facts that would constitute either a breach of contract or a deceptive trade practice."

With sagacity, we perceive the trial judge simply believed that the preponderance of the evidence was established by the testimony of Weir, Riddle and Transou. The fact finder simply accepted their testimony and did not accept the testimony, on this point of error, coming from W.P. "Pete" Gotcher and Holman. Under this record, there is no error. We overrule Point of Error No. 4. As we view it, following the proper disposition of this point of error, we do not reach the question of whether the Appellant established himself as having consumer status. See *TEX.BUS. & COM. CODE ANN. sec. 17.45(4)* (Vernon Pamph. Supp.1986); *Riverside National Bank v.*

*Lewis,* 603 S.W.2d 169 (Tex.1980). We overrule each of Appellant's points of error, except No. 5—his last.

We affirm, in all things, the judgment below as it is written between W.P. "Pete" Gotcher and Lamar State Bank.

## GOTCHER'S ACTION AGAINST TRANSOU AND RIDDLE

■ The Appellant's last point of error advances that the trial court erred in instructing verdicts in favor of cross-defendants, Transou and Riddle, and further erred in not awarding contribution and/or indemnity in favor of Gotcher against Transou and Riddle. When Gotcher rested his case, the cross-defendants moved for what was termed an "instructed verdict". The court granted the same. It was error, under this record, to grant an "instructed verdict". A careful review of the statement of facts shows that this action over against Transou and Riddle was not fully developed. The evidence on this point was deeply conflicting. We find merit in Appellant's Point of Error No. 5.

In *Cameron County Good Govern. League v. Ramon,* 619 S.W.2d 224 (Tex. Civ.App.—Beaumont 1981, writ ref'd n.r. e.), we find a unanimous court writing:

> "In a non-jury trial, when the plaintiff rests, the defendant may move for judgment, and the court applies to such motion the same rules which would determine the propriety of instructing a jury to return a verdict. *Casey v. Sanborn's, Inc. of Texas,* 478 S.W.2d 234, 236 (Tex. Civ.App.—Houston [1st Dist.] 1972, no writ); 4 R. McDonald, *Texas Civil Practice* sec. 16.04 (rev. 1971). Plaintiffs, therefore, are entitled to the most favorable construction that the evidence they produced will bear and to the benefit of all reasonable inferences arising therefrom. *Rhinetubes, Inc. v. Norddeutscher Lloyd,* 335 S.W.2d 269 (Tex.Civ.App.—Houston 1960, writ ref'd n.r.e.); *Evans v. Houston Printing Corporation,* 217 S.W.2d 85 (Tex.Civ.App.—Galveston 1948, writ ref'd n.r.e.)."

Having found error, we reverse that part of the judgment between Gotcher and Transou & Riddle and remand for new trial on Appellant's *Point of Error No. 5 only.* We order this remand also in the interest of justice. We reverse the judgment only as it affects Gotcher, vis-a-vis Transou and Riddle, and remand only Gotcher's claim for contribution and indemnity as against Transou and Riddle. This ruling does not affect the judgment obtained in favor of Lamar State Bank against W.P. "Pete" Gotcher.

AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.